UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:16-cv-00617-RJC-DCK

| CATLIN SPECIALTY INSURANCE COMPANY, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | **ORDER** |
| STANLEY RECREATION CLUB, INC., ET AL., | ) | |
| Defendants. | ) | |

**THIS MATTER** comes before the Court on Catlin Specialty Insurance Company's ("Catlin") Amended Complaint for Declaratory Judgment, (Doc. No. 19); Jeffrey Nicholson's, Kristi Nicholson's, and L.C.N.'s (collectively, "the Nicholsons") Answer to Amended Complaint, (Doc. No. 20); Catlin's Motion for Summary Judgment, (Doc. No. 33); its memoranda in support, (Doc. No. 33-1); the Nicholsons' Motion for Default, (Doc. No. 37); their Motion for Summary Judgment, (Doc. No. 38); their Response in Opposition to Catlin's Motion for Summary Judgment, (Doc. No. 39); and Catlin's Reply, (Doc. No. 41).

### I. BACKGROUND

A. Procedural Background

On August 11, 2016, Catlin filed its Complaint for Declaratory Judgment against Stanley Recreation Club, Inc. ("the Club"), Joshua Roberts, Jerry N. Ragan, James Abernethy, and the Nicholsons. (Doc. No. 1). The Nicholsons filed an Answer with accompanying crossclaims against the Club and counterclaims against Catlin. (Doc. No. 8). Catlin then amended its Complaint on October 7, 2016, to which the Nicholsons filed a corresponding answer. (Doc. Nos.

19, 20). Roberts, Abernethy, and the Club failed to answer or otherwise appear before the Court. Accordingly, on December 19, 2016, the Clerk entered default against the Club, Abernethy, and Roberts pursuant to a motion filed by Catlin. (Doc. Nos. 25–28). On April, 28, 2017, Catlin filed its Motion for Summary Judgment against the Nicholsons. (Doc. No. 33). On the same day, the Nicholsons then filed a Motion for Default Judgment against the Club and a Motion for Summary Judgment against Catlin. (Doc. Nos. 37, 38).

B. Factual Background

On May 24, 2016, the Nicholsons filed an underlying tort action in North Carolina State Court against the Club, James Abernethy, and Joshua Roberts. In that suit, the Nicholsons allege that the Club and the coaches of its swim team, Abernethy and Roberts, were negligent when L.C.N., Jeffery and Kristi Nicholson's daughter, dove off of a starting block and hit her head on the bottom of the Club's pool, resulting in injury. (Doc. No. 19-2; 38-1). Subsequent to the filing of that action, Catlin, an insurance company, brought this suit seeking a declaratory judgment clarifying the scope of Catlin's indemnity obligation in the state tort action in light of the insurance policy it signed with the Club. (Doc. No. 19). Catlin asserts that a Members Exclusion Clause within its insurance policy ("the Policy") with the Club prevents coverage over the Nicholsons' underlying state tort claim. While the clause may seem straight forward, the Policy fails to later define the term "member." The main issue of Catlin's current action concerns whether the Nicholsons qualify as "members" of the Club, which then determines whether the Exclusionary Clause bars insurance coverage over their state court negligence claim.

Before proceeding to this Policy's application to the Nicholsons, some background on the Club and its relationship with Abernethy, Roberts, and the Nicholsons is necessary. To begin with,

the Club functions as a recreational center, providing access to a pool. (Doc. Nos. 33 at 3; 38 at 5). The Club solicits memberships, which grant unlimited pool access as well as discount prices for services such as the Club's swim team and swim lessons. (Doc. No. 33 at 3; 33-2 ¶¶ 9, 25). Abernathy and Roberts served as coaches of the Club's swim team, the Stanley Sharks. (Doc. No. 33-4 ¶ 17, 19). The record shows that the Nicholsons first applied for membership with the Club in 2011. (Doc. Nos. 33-2; 38-1). This application was subsequently accepted by the Club's Board when they signed the Nicholsons' application. (Doc. No. 8-3). From 2011–15, the Nicholsons continued to pay annual dues to the Club and, in return, accepted the benefits of membership. This included taking advantage of the member-discounted registration price for the Club's swim team. (Doc. No. 33-2 ¶¶ 24–25). Rather than paying the $55 price for non-members, the Nicholson family paid the $45 member price to register their daughter, L.C.N. (Id.).

The Nicholsons do not dispute that they have continued to pay annual dues in accordance to the Bylaws. Nor do they dispute that the Board approved of their membership application or that they took advantage of the benefits memberships usually offer. The Nicholsons only assert that they never received a membership certificate mentioned in the Club's Articles of Incorporation and Bylaws, which they argue precludes their status of Stanley Club members. (Doc. No. 38-1 ¶ 6).

## II. CATLIN'S AND THE NICHOLSONS' CROSS MOTIONS FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A

fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." Id. at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. Id. at 249-50.

A. The Court Will Not Address the Nicholsons' Status as "Insureds" or "Uninsureds"

The Court first addresses the Nicholsons' counterclaim seeking declaratory judgement regarding their status under the Policy. (Doc. No. 8 at 17). Specifically, the Nicholsons claim, and Catlin does not oppose, that they are not insureds under the Policy (Doc. No. 38 at 8). Catlin contends rather that the Court lacks jurisdiction over this issue because the determination of the Nicholsons' status "is not a 'controversy of sufficient immediacy and reality.'" (Doc. No. 33 at 19). Catlin points out that no allegation exists imputing liability on the Nicholsons under the policy, which renders the question of their status as insureds moot. (Id.).

The Court declines to extend jurisdiction over this issue. There is no need to clarify the legal relationship of the Nicholsons because no uncertainty exists regarding the Nicholsons' status as uninsureds. See Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co., 139 F.3d 419, 422 (4th Cir. 1998) (allowing district courts to exercise discretion and decline issuing a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, when it would not end any uncertainty, insecurity, or controversy giving that gave rise to the proceeding).

B. The Nicholsons are "members" as used in the Policy.

The main contention between the parties is how one interprets the term "member" within Catlin's insurance policy with the Club? (Doc. Nos. 33, 38). Again, the relief sought by both parties is declaratory in nature. (Doc. Nos. 8, 19). Here, the Court finds sufficient controversy to warrant extending jurisdiction. The parties submit different constructions of the term. The Court will exercise jurisdiction over these claims for declaratory relief because the issue, while referencing the underlying state tort claim, is not necessarily within the scope of the state court action. NGM Ins. Co., 642 F. Supp. 2d at 515–16 (finding that, when determining if jurisdiction

5

over declaratory relief should be declined in the interest of federalism, efficiency, and comity, district courts should consider, among other factors, the scope of the state court proceedings). The Nicholsons have voluntarily dismissed Catlin from their underlying action, reducing the possibility that this Court's holding conflicts with the state court's conclusions. The notions of federalism, efficiency, and comity are therefore sufficiently safeguarded. See L.C.N., et. al. v. Abernethy, et al., 16-CVS-2003; see also Penn–America Ins. Co. v. Coffey, 368 F.3d 409 (4th Cir. 2004) (allowing the exercise of jurisdiction over a declaratory relief claim when contractual coverage over an insured and other defendants would not have been decided in an existing, underlying state court action).

Matters of jurisdiction aside, the disputed clause provides:

MEMBERS EXCLUSION

> This endorsement modifies insurance provided under the following:
> COMMERCIAL GENERAL LIABILITY COVERAGE FORM
>
> SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions; COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, 2. Exclusions are amended and the following added:
>
> This insurance does not apply to any claim or suit for damages brought by any insured, or members of any insured organization, association, club, society or foundation against another insured or member of any such organization, association, club, society or foundation.

(Doc. No. 33-3 at 105). Because "member" is not defined elsewhere within the Policy, Catlin claims that the Court should construe the term in accordance with its plain and ordinary meaning. (Doc. No 33-1 at 9). "Member" is defined as "one of the individuals composing a group" or "a person or thing that is part of a group." (Id. at 11) (quoting Member, MERIAM-WEBSTER,

6

https://www.merriam-webster.com/dictionary/member (last visited Dec. 6, 2017), and Member, CAMBRIDGE DICTIONARY, http://dictionary.cambridge.org/us/dictionary/english/member (last visited Dec. 6, 2017)). Taking this route, Catlin argues that the Nicholsons fall within the definition of "member," thus precluding coverage of the underlying tort action under the Policy. (Doc. No. 33-1 at 15–16). Catlin points to the fact that the Nicholsons pay annual dues and enjoy the membership rights when participating in the Club. (Id. at 15).

The Nicholsons contend that the Court should define "member" as what the Club would have understood the term to mean at the time of contracting with Catlin. (Doc. No. 38 at 10). To shed light on the Club's purported perception at the time of contracting, the Nicholsons point to three sources through which context emerges and, with it, the intended definition of "member." (Id.). The first source is North Carolina Nonprofit Corporation Act, which defines "member" as:

> [A] person who is, by the articles of incorporation or bylaws of the corporation, either (i) specifically designated as a member or (ii) included in a category of persons specifically designated as members. A person is not a member solely by reason of having voting rights or other rights associated with membership

N.C. GEN. STAT. § 55A-1-40(16). Given that the Club is a nonprofit corporation located in North Carolina, the Nicholsons argue that the Court should heed the NCNCA's language and further recognize a second and third source—the Club's Articles of Incorporation and Bylaws—to determine who is "specifically designated as a member." (Doc. No. 38 at 11). In doing so, the Nicholsons point to language within the Club's Articles that states: "The membership of the Corporation shall consist of the initial Board of Directors, their duly elected successors, and any person who shall *hold membership certificates* issued in accordance with and subject to the provisions of the by-laws of the Corporation." (Doc. No. 8-1) (emphasis added). The Nicholsons

7

also point to the Club's Bylaws, which provide that "a duly approved family unit *shall be issued a Certificate of Membership* upon receipt of the membership fee as determined in Article VII, Section 2." (Doc. No. 8-2) (emphasis added). Combining these sources creates "context," the Nicholsons argue, which proves that the exclusion clause is inapplicable to them since they have never received a "Certificate of Membership" despite their yearly dues paid to receive "membership discounts." (Id. at 9) (citing Doc. No. 37 at 8)).

The Nicholsons' argument is unpersuasive. To begin with, the meaning of language within an insurance policy is a matter of law. Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co., 172 S.E.2d 518, 522 (N.C. 1970). The first step is to determine whether the term "member" is ambiguous, that is, whether the term is one that is "fairly and reasonably susceptible to either of the constructions for which the parties contend." Wachovia, 172 S.E.2d at 522. A term is not ambiguous merely because a party "makes a claim based on a construction of its language which the company asserts is not its meaning." Id. Courts construe ambiguous terms in favor of a policyholder and against the insurance company. Id. When faced with unambiguous terms, courts must enforce the contract as written and may not "under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay." Id.; see also Watlington v. N.C. Farm Bureau Mut. Ins. Co., 446 S.E.2d 614, 616 (N.C. App. 1994).

The Court applies an objective construction to unambiguous terms. The Court must determine what the parties intended a contract to cover. Id. In doing so, non-technical terms are given their ordinary meaning when not otherwise defined within a contract. Id. A non-technical term is one used in common, daily speech and therefore should be defined by the meaning

commonly agreed to by laymen, even if that term otherwise acquired legal usage. See Grant v. Emmco Ins. Co., 243 S.E.2d 894, 897 (N.C. 1978). ("[W]ords which are used in common, daily, non-technical speech, should, in the absence of evidence of a contrary intent, be given the meaning which they have for laymen in such daily usage, rather than a restrictive meaning which they may have acquired in legal usage."). When confronted with technical terms, North Carolina courts "are bound to construe [them] according to their technical meanings if 'it is clear that the parties intended the words to have a specific technical meaning.'" SAS Inst., Inc. v. World Programming Ltd., 874 F.3d 370, 382–83 (4th Cir. 2017) (quoting Allstate Ins. Co. v. Runyon Chatterton, 518 S.E.2d 814, 816–17 (N.C. 1999)).

The Court does not find the term "membership" ambiguous. Many people use "member" in daily, common speech even if it acquires some legal significance in other contexts. Nor is this a technical term. Nothing in the Policy indicates that the parties intended the term "member" to accrue some specific definition outside of its normal usage in the English language. The Membership Exclusion Clause references membership in the most general of terms—that of clubs, associations, societies, and foundations. To construe "member" as a technical term would betray the simple, more encompassing usage of that term in the clause. See Id. (finding that if parties intended the word "production" to reference some "type of environment," the phrasing of the term within a clause did not reflect that intent where a more direct phrase could have been used). Here, if the parties intended to define membership by way of the North Carolina Nonprofit Corporation Act, the Membership Exclusion Clause would surely have mentioned it.

All of this is only proven by the fact that Catlin and the Nicholsons do not actually disagree with the definition of membership. Rather, the Nicholsons merely argue that there is a procedure

9

within the Club's governing instruments to become a "member."  Put another way, because the procedure of procuring a certification of membership was not followed exactly, the Nicholsons argue that they never became individuals composing a group.  Catlin, on the other hand, believes that the payment of fees and receipt of benefits proves membership with the Club, even if some formality, such as a certificate, is not abided by strictly.

The Court does not find that the Membership Exclusion Clause employs the term "member" in such a technical sense requiring resort to analysis of the procedural requirements listed within the Club's governing articles.  Surely if the Policy were to mandate such an exercise, the clause in question would simply reference membership in accordance with the procedures and requirements of said organization.  If the Court were to add technical meaning to this term, suddenly the provision bargained for by both Catlin and the Club would gain more coverage than intended.  The Club would extract more from the Policy than it bargained for, simply granting memberships all but in name by withholding a membership certificate.  That result is absurd.  On that basis, the Club could solicit membership fees and gain income as if it were enlisting members.  Individuals would thereby pay for and retain benefits as if they were members.  But, simply because the Club refused or ignored giving membership certificates, the Policy would nonetheless cover these almost-members, allowing the Club to enjoy more coverage than they are entitled.  Courts cannot, "under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay."  Wachovia, 172 S.E.2d at 522.

Even if the Court were to agree with the Nicholsons' assertion that the Club's governing articles define what constitutes membership in the Club, they would nonetheless be considered
10

members. In fact, after reading the Clubs Articles and Bylaws, it seems to the Court that all of the procedures to become a member have been fulfilled.

The Articles point us to the Bylaws in order to discern the steps needed to obtain them. In doing so, the Bylaws state the following:

> Membership in the Corporation shall consist of family units, which shall include all regular members of a single household, when recommended by a member for acceptance into the Corporation and upon election to membership by a majority if the Board of Directors, and upon the payment of the fees and dues as herein set forth. Members in this Corporation shall be by election by the Board of Directors, and by no other means whatsoever. A duly approved family unit shall be issued a Certificate of Membership upon receipt of the membership fee as determined in Article VII, Section 2.

(Doc. No. 8-2 at 2).

The plain reading of the above provision sets out the following requirements for membership: (1) the applicant in question must be a "family unit" comprised of members of a single household; (2) the applicant must be recommended by a member for acceptance into the Corporation; (3) a majority of the Board of Directors must approve of such a recommendation; and (4) the applicant must pay membership fees as described in the Bylaws. The Nicholsons would add the receipt of a membership certification as a fifth element. The Court does not read the language as adding an additional requirement. Rather, the provision shifts the subject from what an applicant must do to become a member to an obligation the Club owes to newfound, "duly approved," members. The Bylaws do not state that a member must receive a certification to be a member, but rather states that the Club owes a duty to furnish members their certificates.

The uncontroverted facts within the record further support the Court's interpretation of the

Club's Articles and Bylaws. After fulfilling the above elements,[1] the Club allowed the Nicholsons to take part in their membership discounts and advantages. The Nicholsons then received discounted registration rates for the Club's swim team. (Doc. No. 33-2 ¶¶24–25). Furthermore, from 2011–15, the Nicholsons continued to pay annual dues to the Club and, in return, accepted the continued benefits of membership. (Doc. No. 33-2 ¶¶ 12–21, 25).

While the Nicholsons are correct that they never received a certificate from the Club, the Club had not given out certificates to any new members since 2011. (Id.). There is no dispute that the Nicholsons were labeled "members," were treated as "members," nor that they sought and received membership yearly. In fact, upon the Court's reading of the record, Defendant's essentially admit that they were members by paying dues entitled "membership fees" or "annual membership dues." (Doc. Nos. 8-2 at 2, 4; 8-3; 33-2 ¶¶ 12–21; 38-1 ¶ 5).

C.   The Members Exclusion Clause is not an Exculpatory Clause.

The Nicholsons also claim that the Members Exclusion Clause is an exculpatory clause rendered unenforceable because it limits a party's liability and therefore waives others' rights to a jury trial. (Doc. No. 38 at 13–14). In making this argument, the Nicholsons seem to misunderstand what an exculpatory clause is and what the nature of this present suit aims to achieve. An exculpatory clause exculpates, or releases, parties from liability for negligence. Hyatt v. Mini Storage on the Green, 763 S.E.2d 166, 169 (N.C. App. 2014); see also EXCULPATORY

---

[1] Here, the four elements were fulfilled. First, the Nicholsons are considered a "family unit" as described in the Bylaws. (Doc. No. 38-1 ¶ 3). Second, the Nicholsons were able to procure and complete an application for membership. (Doc. Nos. 33-2 at 7; 38-1 ¶ 5). Third, the Club accepted the Nicholsons' applications for membership by signing the application. (Doc. No. 33-2 at 7). Finally, the Nicholsons paid the membership fee. (Doc. Nos. 33-2 ¶¶ 12–26; 38-1 ¶ 5). This marks the point that the Nicholsons became "members" under the Club's Bylaws. The Nicholsons were then entitled to—and remain entitled to—receiving a membership certificate.

12

CLAUSE, Black's Law Dictionary (10th ed. 2014) ("A contractual provision relieving a party from liability resulting from a negligent or wrongful act."). These clauses are not favored under North Carolina law and are accordingly construed against the party seeking to escape liability. (Id.).

It is obvious that the insurance policy does not affect the ability for the Nicholsons to bring a negligence action against the Club or its employees and volunteers. The very existence of the underlying state tort action proves this. The Policy only pertains to whether those claims brought by the Nicholsons are covered by insurance. Whether or not the Nicholsons signed an exculpatory clause with the Club is a matter for the underlying, pending tort action.

### III.     THE NICHOLSONS' MOTION FOR DEFAULT JUDGMENT

The entry of default judgment is governed by Rule 55 of the Federal Rules of Civil Procedure which provides in relevant part that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." FED. R. CIV. P. 55(a).

Upon the entry of default, the defaulted party is deemed to have admitted all well-pleaded allegations of fact contained in the complaint. Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001); Weft, Inc. v. GC Inv. Assocs., 630 F. Supp. 1138, 1141 (E.D.N.C. 1986) (citations omitted); see also FED. R. CIV. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."). Nevertheless, the defendant is not deemed to have admitted conclusions of law and the entry of "default is not treated as an absolute confession by the defendant of his liability and of the Catlin's right to recover." Ryan, 253 F.3d at 780 (citations omitted); see also E.E.O.C. v. Carter Behavior Health Servs., Inc., No. 4:09-cv-122-F, 2011 WL 5325485, at *3 (E.D.N.C. Oct. 7,

13

2011). Rather, in determining whether to enter judgment on the default, the court must determine whether the well-pleaded allegations in the complaint support the relief sought. See Ryan, 253 F.3d at 780 (citing Weft, 630 F. Supp. at 1141); DIRECTV, Inc. v. Pernites, 200 F. App'x 257, 258 (4th Cir. 2006) ("'[A] defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law'") (quoting Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975)); Arista Records, LLC v. Gaines, 635 F. Supp. 2d 414, 416 (E.D.N.C. 2009); 10A Wright, Miller & Kane, Federal Practice and Procedure § 2688 (3d ed. Supp. 2010) ("[L]iability is not deemed established simply because of the default ... and the court, in its discretion, may require some proof of the facts that must be established in order to determine liability.").

To that end, the Fourth Circuit has "repeatedly expressed a strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits." Colleton Preparatory Acad., Inc. v. Hoover Univ., Inc., 616 F.3d 413, 417 (4th Cir. 2010) (citations omitted). Nonetheless, default judgment "may be appropriate when the adversary process has been halted because of an essentially unresponsive party." SEC v. Lawbaugh, 359 F. Supp. 2d 418, 421 (D. Md. 2005). Entry of default judgment is left to the sound discretion of the trial court. Duke Energy Carolinas, LLC v. BlackRock Coal, LLC, No. 3:11-cv-616-RJC-DSC, 2012 WL 1067695 (W.D.N.C. Mar. 29, 2012) (granting default judgment in the plaintiff's favor after finding that service of the complaint and summons on defendant was sufficient yet defendant failed to defend); CF Cloninger Trucking IL Inc. v. SourceOne Group, Inc., No. 3:08-cv-00320-FDW, 2009 WL 35191 (W.D.N.C. Jan. 5, 2009) (granting default judgment when defendant failed to defend complaint). Accord Lawbaugh, 359 F.Supp.2d at 421 (granting default judgment for permanent

14

injunction, disgorgement and a civil monetary penalty where defendant failed to answer complaint alleging securities fraud and misappropriation). Although the clear policy of the Rules is to encourage dispositions of claims on their merits, see Reizakis v. Loy, 490 F.2d 1132, 1135 (4th Cir.1974), trial judges are vested with discretion, which must be liberally exercised, in entering [default] judgments and in providing relief therefrom." United States v. Moradi, 673 F.2d 725, 727 (4th Cir. 1982).

> A. The Nicholsons' Do Not Sufficiently Allege Facts Warranting Default Judgment Against the Club.

The Nicholsons filed a Motion for Default Judgement against the Club requesting the Court to declare that, as of July 16, 2015, one or more of the conditions of membership to the Club had not been satisfied. (Doc. No. 37 at 5). Even after construing all the alleged facts of Defendant's crossclaim as true, the Court finds that the Nicholsons are "members" as used in the Policy. In fact, after reviewing the alleged facts, the Nicholsons admit to fulfilling all requirements of membership at the Club. As mentioned above, the Court does not interpret the Club's Bylaws to include a membership certificate as a necessary requirement to become a member. Rather, the membership certificate is a ministerial act owed by the Club to its "duly approved" members. The Court therefore cannot grant default judgment in favor of the Nicholsons in regards to this issue.

> B. The Court declines to exercise jurisdiction over the declaratory relief the Nicholsons request in regards to the Bylaws' reasonableness.

The Nicholsons also request that this Court find Article VI, Section 5(H), of the Bylaws unreasonable, oppressive, extortionate, and against public policy. (Doc. Nos. 8 at 14; 37 at 12–13). This provision of the Bylaws states, "The Corporation assumes no responsibility, and members or their guests can have no claim against the Corporation for any accident or injury to

15

any person or their property." (Doc. No 8-2 at 3).

The Court declines to consider this issue. In exercising its discretion over declaratory relief, the Court notes that the Nicholsons raise this exact question in their underlying state tort suit. (Doc. No. 33-4 ¶ 64(c)). The core of a court's discretion over declaratory judgment actions rests on the maxim that such actions should not be used "to try a controversy by piecemeal, or to try particular issues without settling the entire controversy, or to interfere with an action which has already been instituted." Aetna Cas. & Sur. Co. v. Quarles, 92 F.2d 321, 325 (4th Cir. 1937). A district court must pay the utmost attention when deciding if it should exercise jurisdiction over declaratory judgment actions while an ongoing parallel state action exists. The notions of "federalism, efficiency, and comity" must prevail. NGM Ins. Co., 642 F. Supp. 2d at 515.

In the face of an ongoing, pending case involving the same claim, the Court must weigh four factors when considering the exercise of jurisdiction over a petition for declaratory judgment that threatens federalism, efficiency, and comity: "(1) whether the state has a strong interest in having the issues decided in its courts; (2) whether the state could resolve the issue more efficiently than the federal courts; (3) whether the presence of 'overlapping issues of fact or law' might create unnecessary entanglement between the state and federal courts; and (4) whether the federal action is mere 'procedural fencing.'" Id. (citing Centennial Life Ins. Co., 88 F.3d at 377).

The Court notes that the state's interest in resolving the Nicholsons' claims against the Bylaws is relatively low. The presented questions of state law—the validity of a Bylaw's provision—are not considered particularly "difficult, complex, or unsettled." Id.; see also Wausau Underwriters Ins. Co. v. DM Farms of Rose Hill, LLC, No. 7:07-CV-208-F, 2008 WL 2148831 (E.D.N.C. May 21, 2008) (unreported); First Fin. Ins. Co. v. Crossroads Lounge, 140 F.Supp.2d

686, 695 (S.D.W. Va. 2001). Nor does the Court see particular evidence of procedural fencing. However, the Court does find that the second and third elements—judicial efficiency and overlapping issues of fact or law—way heavily in favor of declining jurisdiction over the validity of Article VI, Section 5(H) of the Bylaws.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Catlin's Motion for Summary Judgment, (Doc. No. 33), is **GRANTED**;

2. Defendant's Motion for Default Judgment, (Doc. No. 37), is **DENIED**;

3. Defendant's Motion for Summary Judgment, (Doc. No. 38), is **DENIED**; and

4. The Clerk of Court is directed to close this case.

Signed: March 30, 2018

Robert J. Conrad, Jr.
United States District Judge